**FILED**

SEP 17 2020

**U. S. DISTRICT COURT**
**EASTERN DISTRICT OF MO**
**ST. LOUIS**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

UNITED STATES OF AMERICA,       )
                                )
        Plaintiff,              )
                                )
v.                              )       No.   **4:20CR568 SEP-DDN**
                                )
FRANCO SICURO, M.D.,            )
and                             )
CARLOS HIMPLER,                 )
                                )
        Defendants.             )

## INDICTMENT

The Grand Jury charges:

## BACKGROUND

### Defendants

1.      At all times relevant to this indictment, defendant Franco Sicuro, M.D.

("Dr. Sicuro"), was a psychiatrist, licensed to practice in the state of Missouri. Since in or about

June 2001, Dr. Sicuro has owned, operated, been the medical director, or otherwise been

associated with one or more health care related businesses, including Millennium Psychiatric

Associates ("MPA"), Advanced Geriatric Management ("AGM"), Centrec Care, Sleep

Consultants of St. Louis, Midwest Toxicology Group ("MTG" or "Midwest"), Genotec Dx

("Genotec"), and Benemed Diagnostics.

2.      At times relevant to this indictment, defendant Carlos Himpler ("Himpler") lived

in St. Louis County, Missouri and described himself as a business development strategist. Since

in or about June 2008, Himpler has owned and operated one or more health care related

businesses, including Rest Easy of St. Louis, Sleep Consultants of St. Louis, Midwest, Genotec,

1

Core Toxicology, and Core Dx.

3.      At all relevant times, Dr. Sicuro and Himpler, as individuals or through their businesses, submitted and caused to be submitted reimbursement claims to health care benefit programs. As defined in Title 18, United States Code, Section 24, a health care benefit program is any public or private plan or contract, affecting commerce, that provides any medical benefit, item, or service and any individual or entity providing a benefit, item, or service under such plan or contract.

4.      The Medicare Program and the Medicaid Program (known as MO HealthNet in Missouri) are public health care benefit programs. United Health Care/Optum, Aetna Coventry, Anthem Blue Cross Blue Shield, CIGNA, Humana, and the Welfare Fund of the United Food and Commercial Workers Union, Local # 655 ("UFCW Welfare Fund") are private health care benefit programs ("Private Health Care Insurers").

**Relevant Medicare Provisions**

5.      The United States Department of Health and Human Services, through the Centers for Medicare and Medicaid Services ("CMS"), administers the Medicare Program, which reimburses enrolled providers for certain benefits, items, and services provided to the elderly and disabled beneficiaries. Medicare Part B reimburses health care providers for covered health care services provided to Medicare beneficiaries in outpatient settings.

6.      CMS acts through fiscal agents called Medicare Administrative Contractors or "MACs," which are statutory agents for CMS for Medicare Part B. The MACs are private entities that review claims and make payments to providers for services rendered to Medicare beneficiaries. The MACs are responsible for processing Medicare claims arising within their assigned geographic areas, including determining whether the claim is for a covered service.

2

Wisconsin Physicians Service Insurance Corporation ("WPS") is the Part B MAC for Eastern

Missouri and thus processes reimbursement claims that Dr. Sicuro and Himpler, as individuals or

through their businesses, submit to Medicare.

7.     To receive Medicare reimbursement, providers must make appropriate application

to the MAC and execute a written provider agreement. The provider agreement obligates the

provider to know, understand, and follow all Medicare regulations and rules. After successful

completion of the application process, the MAC assigns the provider a unique provider number,

which is a necessary identifier for billing purposes.

8.     Medicare providers must retain clinical records for the period required by state

law or five years from date of discharge if there is no requirement in state law.

<u>Defendant Dr. Sicuro's Enrollment in Medicare</u>

9.     Between 2010 and 2015, defendant Dr. Sicuro completed and signed several

Medicare enrollment applications as an individual provider or on behalf of his businesses.

Contained in the September 13, 2010 application was Section 14, entitled "Penalties for

Falsifying Information," which informed Dr. Sicuro that he could be criminally prosecuted (a)

for executing or attempting to execute a health care fraud scheme or using false or fraudulent

statements or representations to obtain money from a health care benefit program or (b) making

or using false or fraudulent statements or representations in connection with the delivery or

payment for health care benefits, items, or services.

10.     In each of the six applications, Dr. Sicuro signed the "Certification Statement" of

the application and thereby certified:

> I have read and understand the Penalties for Falsifying Information, as printed in
> the application. I understand that any deliberate omission, misrepresentation, or
> falsification of any information . . . contained in any communication supplying
> information to Medicare . . . [may be criminally prosecuted].

3

I agree to abide by the Medicare laws, regulations and program instructions . . . including… the Federal anti-kickback statute . . .

I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

Defendant Himpler's Enrollment in Medicare

11.     On or about February 14, 2015, Himpler completed and signed a Medicare enrollment application on behalf of Genotec. In the application, Himpler identified himself as the "CEO," director/officer, and a 5% or greater owner of Genotec. Contained in the application was Section 14, entitled "Penalties for Falsifying Information," and Section 15, entitled "Certification Statement," as described in Paragraphs 9 and 10 above. Thus, Himpler was informed that he could be criminally prosecuted (a) for executing or attempting to execute a health care fraud scheme or using false or fraudulent statements or representations to obtain money from a health care benefit program or (b) making or using false or fraudulent statements or representations in connection with the delivery or payment for health care benefits, items, or services.

**Relevant Missouri Medicaid Provisions**

12.     MO HealthNet administers the Missouri Medicaid Program, which is jointly funded by the State of Missouri and the federal government. Missouri Medicaid reimburses health care providers for covered services rendered to low-income Medicaid recipients.

13.     A Medicaid provider must enter into a written agreement with MO HealthNet to receive reimbursement for medical services to Medicaid recipients and must agree to abide by MO HealthNet's regulations in rendering and billing for those services.

**Current Procedural Terminology (CPT) Codes**

14.     In seeking reimbursement from health insurance companies, health care

4

providers use numeric codes, known as "CPT Codes," to describe the services they provide. The CPT codes are contained in the Physicians Current Procedural Terminology manual. The CPT manual is published by the American Medical Association ("AMA") and its body of physicians of every specialty, who determine appropriate definitions for the codes. By submitting claims using these CPT codes, providers represent to the insurance companies and their patients that the services described by the codes were in fact provided.

15.     Reimbursement rates for the CPT codes are set through a fee schedule, which establishes the maximum amount that the provider will be paid for a given service, as identified by the CPT code.

### Relevant Provisions Concerning Clinical Laboratories

16.     The Clinical Laboratory Improvement Amendments and regulations promulgated pursuant to this federal statute (collectively referred to hereafter as "CLIA") provide for federal certification and oversight of clinical laboratory testing. In general terms, CLIA establishes quality standards for laboratory testing performed on specimens, such as blood, body fluid and tissue taken from humans, for the purpose of diagnosis, prevention, or treatment of disease, or the assessment of health.

17.     An entity, performing even one test for these purposes, is considered to be a laboratory and must register and obtain a CLIA certification. An entity seeking CLIA certification for a laboratory in Missouri must complete an application and submit it to the Missouri CLIA Laboratory Program, Bureau of Diagnostic Services Evaluation of the Missouri Department of Health & Senior Services ("Missouri CLIA Program"). The Missouri CLIA Program oversees the CLIA certification program in Missouri and conducts inspections of laboratories on a routine basis, as well as investigating complaint allegations. A separate CLIA

certificate is required for each location where testing is to be performed. Title 42 CFR 493 –
Laboratory Requirements.

18.     At all relevant times, Medicare, Medicaid, and the Private Health Care Companies
(collectively "Health Care Insurers") would not pay for clinical laboratory tests performed by
entities that did not comply with state and federal requirements. Health Care Insurers uniformly
required entities billing for clinical laboratory tests to list on the reimbursement claim form the
name, address, and CLIA number of the laboratory performing the tests. Only in this way could
the Health Care Insurers and regulatory agencies like CMS and the Missouri CLIA Program
ensure that only CLIA certified laboratories were performing tests on human specimens.

### Count 1- Conspiracy
### 18 U.S.C. § 371

19.     Paragraphs 1 to 18 are incorporated by reference as if fully set out herein.

20.     Beginning in or about 2014, and continuing to in or about 2018, in the
Eastern District of Missouri and elsewhere,

**FRANCO SICURO, M.D.,**
**and**
**CARLOS HIMPLER,**

the defendants herein, and persons known and unknown to the Grand Jury, did unlawfully,
willfully, and knowingly combine, conspire, and agree with persons known and unknown to the
Grand Jury to commit the following offenses against the United States:

   a.     to defraud the United States, namely, the Centers for Medicare and

          Medicaid Services, an agency of the United States Department of Health

          and Human Services, through deceit, craft or trickery, and by means that

          are dishonest, that is, by impeding, interfering, and obstructing the lawful

          government functions of the Centers for Medicare and Medicaid Services'

6

enforcement of the CLIA requirements for clinical laboratories and its

administration of health care and health care plans, including Medicare

and Medicaid, in violation of Title 18, United States Code, Section 371;

b.　　to defraud a health care benefit program and to obtain, by false and

fraudulent representations, money owned by and under the control of a

health care benefit program, in connection with the delivery and payment

of health care benefits, items, and services, in violation of Title 18, United

States Code, Section 1347(a); and

c.　　to knowingly and willfully falsify, conceal, and cover up by trick, scheme,

and device a material fact, and to make materially false, fictitious, or

fraudulent statements and representations, and make and use materially

false writings and documents knowing the same to contain materially

false, fictitious, and fraudulent statements and entries, in connection with

the delivery of and payment for health care benefits, items, or services, in

violation of Title 18, United States Code, Section 1035(a).

## Purpose of the Conspiracy

21.　　The purpose of the conspiracy was for the defendants:

a.　　to own and operate clinical laboratories that they knew did not comply

with CLIA and other regulations governing clinical laboratories and to

conceal the lack of compliance from regulatory agencies and insurers;

b.　　to submit reimbursement claims to health care benefit programs that

falsely and fraudulently represented that the laboratories owned by the

defendants had performed the tests and to conceal from the insurers and

7

regulatory agencies that the tests had been performed by reference
laboratories; and

c.      to use the payments derived from the fraudulent claims to enrich
themselves and to purchase and acquire real and personal property with
the proceeds of the conspiracy and fraud scheme.

### Manner and Means of the Conspiracy

22.    It was part of the conspiracy that Dr. Sicuro and Himpler operated the medical practices and laboratories, identified below, and used these businesses as a means of committing the criminal offenses described in this Indictment.

23.    In or about February 2001, Dr. Sicuro opened Millennium Psychiatric Associates ("MPA"), which was a group practice providing psychotherapy and other services. MPA was located at 777 Craig ("Craig Building") in St. Louis County, Missouri.

24.    Several years later, in or about 2004, Dr. Sicuro opened a second group practice, Advanced Geriatric Management ("AGM"), which provided counseling and psychotherapy. AGM was located in a building located at 10199 Woodfield ("Woodfield Building"), which was owned by Dr. Sicuro.

25.    In or about 2008, Himpler opened Rest Easy of St. Louis ("Rest Easy"), which performed diagnostic sleep studies. Rest Easy, operated by Himpler, and AGM, operated by Dr. Sicuro, were located in the Woodfield Building. In or about 2012, Dr. Sicuro and Himpler jointly opened Sleep Consultants of St. Louis, which was also located in the Woodfield Building.

26.    Dr. Sicuro, a psychiatrist, had some clinical laboratory testing performed in his medical practice and referred other urine drug specimens to outside laboratories for testing. In or about September 2014, Himpler and Dr. Sicuro decided to open Genotec, a clinical testing

8

laboratory in the Woodfield Building. Himpler incorporated Genotec as a Missouri corporation and listed himself as the organizer and registered agent.

27.     In or about July 2015, Genotec received its CLIA certification and CLIA number, as required under the Clinical Laboratory Improvement Amendments and regulations issued pursuant to this federal statute. At that point, Genotec was authorized to perform tests within the scope of its certification and testing capability.

28.     On or about March 4, 2015, Dr. Sicuro and Himpler incorporated a second laboratory, Midwest Toxicology Group, which held itself out as a clinical testing laboratory. However, Midwest never applied for or received CLIA certification. Thus, Midwest was not authorized by the Missouri CLIA Program or the Centers for Medicare and Medicaid Services to perform tests on human specimens. The lack of CLIA certification also meant Health Care Insurers would not pay for tests performed by Midwest.

Genotec's Fraudulent Billing for Tests Performed by Reference Laboratories

29.     At all times relevant to this Indictment, Genotec did not have the necessary testing equipment to perform quantitative urine drug tests or genetic tests. Genotec did have the equipment and was able to perform qualitative urine drug tests. Qualitative drug tests detect the presence of a drug or substance in the urine and provide a simple "yes" or "no" answer regarding whether the substance has been used or consumed. The much more expensive quantitative drug test is used to determine the quantity or amount of the drug or substance detected in the urine and required testing equipment that Genotec did not have.

30.     It was part of the conspiracy that Genotec received urine specimens, collected from patients residing in the St. Louis metropolitan area, and sent or "referred" the specimens to other laboratories, called reference laboratories, which did the actual testing. The following are

9

some of the reference laboratories that Genotec used for quantitative urine drug testing and genetic testing: Cordant Health Solutions, also known as Forensic Drug Testing Laboratory located in Denver, Colorado; Western Slope Laboratory, located in Troy, Michigan; Phamatech Laboratories and Diagnostics located in San Diego, California; and MediTest Laboratories, located in Irvine, California.

31.     It was further part of the conspiracy that Genotec typically paid the reference laboratories about $125 per specimen for tests performed on the specimen. Upon receiving the test results from the reference laboratories, it was Genotec that submitted reimbursement claims to Health Care Insurers. This type of billing is sometimes referred to as pass-through billing.

32.     As a general rule, Health Care Insurers do not permit pass-through billing and instead require the person or entity performing the clinical laboratory tests to bill for the tests. As an example, Medicare requires that clinical tests be billed directly to Medicare by the laboratory or physician performing the tests. If an outside reference laboratory performs a test referred from a physician or another laboratory, only the reference laboratory may legally bill Medicare for the procedure. Medicare Claims Processing Manual, Section 40.1-"Laboratory Billing for Referred Tests." Medicare recognizes three exceptions to this general rule, none of which are applicable to Genotec because: (a) Genotec was not located in or part of a rural hospital, (b) Genotec and the reference laboratories did not have a common ownership, and (c) Genotec annually referred more than 30% of its laboratory tests to reference laboratories.

33.     Even in those circumstances where a referring laboratory is permitted to bill, the referring laboratory must inform the Health Care Insurer that a reference laboratory actually performed the test. The Medicare Claims Processing Manual, Section 40.1.1-"Claims Information and Claims Forms and Formats" provides: "Independent laboratories shall use

10

modifier 90 to identify all referred laboratory services. . . . The name, address, and CLIA number of both the referring laboratory and the reference laboratory shall be reported on the claim." The use of modifier 90 on the reimbursement claim informs the Health Care Insurer that the test was performed by a reference laboratory and not the laboratory billing for the test.

34.     The Private Health Care Companies, from whom Genotec sought reimbursement, also required that the person or entity performing the test bill for the test. As an example, United Health Care Insurance, also known as Optum, states in its United Healthcare Provider Administrative Guide: "Pass through billing is not permitted and may not be billed to our members. . . . You must not bill our members for any laboratory services for which you lack the applicable CLIA certification." Similarly, Cigna, Aetna, and Humana prohibit pass-through billing except in very limited circumstances, not applicable to Genotec, and will only reimburse for clinical laboratory tests performed by the billing laboratory.

35.     Contrary to this clear guidance, Genotec's standard practice was to pass-through bill Health Care Insurers for tests actually performed by reference laboratories. In thousands of claims, Genotec falsely and fraudulently represented that Genotec itself had performed the tests and deliberately concealed the fact that the tests were performed by the reference laboratories. When Dr. Sicuro and Himpler submitted and caused the submission of these false reimbursement claims, they knew Health Care Insurers did not permit pass-through billing and would not reimburse Genotec, the referring laboratory, for tests performed by the reference laboratories.

36.     It was further part of the conspiracy that Himpler prepared or caused the preparation of the false and fraudulent reimbursement claims submitted by Genotec and Midwest. Dr. Sicuro and Himpler researched the billing codes and chose those that paid the highest reimbursement even when the codes were not the appropriate codes. Later, a company

owned by Dr. Sicuro's daughters began billing for Genotec and Midwest and continued to submit false and fraudulent reimbursement claims.

37.     It was further part of the conspiracy that Genotec and Midwest marked up the urine drug tests when seeking reimbursement. In numerous instances, Genotec and Midwest billed thousands of dollars for tests, although Genotec and Midwest had only paid about $125 to a reference laboratory to perform the test. As an example of the financial harm caused by these extreme mark-ups, between January 2015 and October 2015, the UFCW Welfare Fund of UFCW Local #655 paid Genotec $1,086,450.87 and Midwest $150,596.74 for urine drug tests conducted on specimens collected from seven individuals. Genotec and Midwest only paid the reference laboratories about $5,125.00 to perform all the tests.

38.     It was further part of the conspiracy that on some occasions, Genotec removed the name of the reference laboratory from the report of the test results and substituted the name "Genotec Dx" on the front page of the reports.

Midwest, a Non-CLIA Certified Entity, Billed for Laboratory Tests

39.     It was part of conspiracy that Dr. Sicuro and Himpler caused Midwest to bill for clinical laboratory tests although both knew Midwest was a laboratory in name only. They also knew that Midwest, reportedly located in the Craig Building where Dr. Sicuro had a medical practice, did not have equipment or other supplies necessary to do quantitative urine drug tests and genetic tests. Moreover, both Dr. Sicuro and Himpler knew Midwest never applied for and never received CLIA certification, which they knew was required before a laboratory could perform clinical laboratory tests.

40.     It was part of the conspiracy that Dr. Sicuro and Himpler caused Midwest to submit reimbursement claims that falsely and fraudulently represented that Midwest had

12

performed tests when they knew Midwest had not performed the tests. Dr. Sicuro and Himpler also made or caused other affirmative misrepresentations and material omissions to be included in reimbursement claims submitted by Midwest, including: (a) Midwest used the CLIA number assigned to Genotec, although the Defendants knew the CLIA number could only be used by Genotec for tests performed by Genotec at its location and (b) Midwest did not use the modifier "90" and did not list the name, address, and CLIA number of the reference laboratory where the test was actually performed.

Fraudulent Unbundling of Tests by Genotec and Midwest

41.     A panel test includes multiple tests to be performed on a single blood or urine specimen. Unbundling occurs when the tests in a panel are pulled apart and some or all of the tests are billed separately. Medicare and many private health care insurers require laboratories to bill using the CPT code for the panel and not the CPT codes for each of the separate tests in the panel. In short, Medicare and many private health care insurers prohibit unbundling. In almost all instances, a laboratory receives a lower reimbursement for the panel test than the laboratory would receive if the laboratory billed each or some tests separately.

42.     It was part of the conspiracy that Dr. Sicuro and Himpler caused Genotec and Midwest to separate the tests in a panel into several "bundles" of tests. Genotec would bill for one bundle of tests, using one set of billing codes, and Midwest would bill for another bundle of tests, using a different set of billing codes. This resulted in Genotec and Midwest receiving payments far in excess of what they would have received without the unbundling and also prevented the insurance companies from discovering that two claims were submitted for tests on a single specimen obtained from the same patient on the same date of service.

43.     It was part of the conspiracy that Dr. Sicuro and Himpler caused Midwest and

Genotec to submit numerous claims for the same patient for the same date of service, thereby falsely and fraudulently representing that two separate, unrelated laboratories had performed tests. By using two laboratories, Dr. Sicuro and Himpler hoped to minimize the risk of scrutiny, audits, and investigations. The following chart reflects examples of Genotec and Midwest billing and being paid for tests on a single specimen collected on the same date of service.

| Patient | Insurance Company | Date of Service | Genotec Billed Amount | Genotec Paid Amount | Midwest Billed Amount | Midwest Paid Amount | Total Payments |
|---|---|---|---|---|---|---|---|
| Patient MD | Aetna/Coventry | 9/22/15 | $22,500.00 | $9,000.00 | $2,465.77 | $667.93 | $9,667.93 |
| Patient IH | Aetna/Coventry | 7/13/15 | $2,415.76 | $1,994.18 | $26,999.91 | $13,499.91 | $15,494.09 |
| Patient JH | Aetna/Coventry | 7/6/15 | $7,617.32 | $4,394.31 | $26,999.91 | $8,999.96 | $13,394.27 |
| Patient KH | UFCW | 7/14/15 | $29,230.00 | $24,845.50 | $20,378.90 | $17,322.05 | $42,167.55 |
| Patient MW | UFCW | 7/14/15 | $21,330.00 | $18,130.50 | $20,378.90 | $17,322.05 | $35,452.55 |
| Patient MW | UFCW | 7/28/15 | $22,120.00 | $18,802.00 | $23,091.69 | $19,627.90 | $38,429.90 |
| Patient TL | UFCW | 8/3/15 | $22,120.00 | $18,802.00 | $20,261.69 | $17,222.40 | $36.024.40 |

44.     It was also part of the conspiracy that Dr. Sicuro and Himpler caused separate reimbursement claims to be submitted on different days for the same patient for the same date of service. Each reimbursement claim reflected the same date of service, and the same diagnosis code, but each claim contained 4 to 6 CPT codes for different tests.

Dr. Sicuro's Referrals to Laboratory He Owned

45.     It was further part of the conspiracy that Dr. Sicuro and Himpler intentionally structured Genotec to circumvent federal law, including what commonly is known as the "Stark Law," which prohibits doctors from referring Medicare patients for designated health services to

14

a facility where the doctor has a financial interest. Although Genotec was organized by Himpler, Dr. Sicuro was an owner in fact and had a financial interest in Genotec as evidenced by his receipt of millions of dollars from Genotec for laboratory tests billed by Genotec.

Use of Criminal Proceeds by Dr. Sicuro and Himpler

46.     It was further part of the conspiracy that Dr. Sicuro and Himpler opened a bank account for Genotec DX, LLC, ending in #3273, and a bank account for Midwest Toxicology Group, LLC, ending in #6170, and directed Health Care Insurers to deposit insurance payments in these two accounts. In 2015, Dr. Sicuro and Himpler caused over $15 million in fraudulent insurance payments to be deposited into these two accounts. Thereafter, Dr. Sicuro and Himpler caused funds from the two accounts to be transferred into other accounts owned or controlled by them and used these transferred funds to purchase real and personal property.

**Overt Acts**

47.     In furtherance of the conspiracy and to affect the objects of the conspiracy, the following overt acts, among others, were committed in the Eastern District of Missouri:

a.      On or about September 25, 2015, Dr. Sicuro approved an order for "Labs/Tests: UDS" for Patient CM.

b.      On or about September 26, 2015, Dr. Sicuro initialed the Specimen Final Outcome-Screen and Confirmation Results for tests performed at Forensic Laboratories for Patient K.F.

c.      On or about October 8, 2015, Dr. Sicuro ordered a custom urine drug profile for Patient J.T.

d.      On or about October 14, 2015, Dr. Sicuro ordered a custom urine drug profile for Patient C.C.

15

e.    On or about October 22, 2015, Dr. Sicuro ordered "Labs: UDS" for Patient N.E.

f.    On or about October 29, 2015, Dr. Sicuro ordered "UDS" for Patient K.G.

g.    On or about November 4, 2015, Himpler emailed Karen Sutterer, CLIA Health Facilities Consultant, regarding CLIA accreditation, the purchase of an analyzer, and provided the list of assays tested by Genotec.

h.    On or about November 19, 2015, Himpler met with and answered questions for a CLIA Health Facilities Consultant during the CLIA site-survey at Genotec.

i.    On or about November 23, 2015, Dr. Sicuro emailed himself an email from his daughter, which email contained information concerning reimbursements paid to both Himpler and Dr. Sicuro for Genotec and Midwest.

j.    On or about April 4, 2016, in response to United Health Care's (UHC) request for medical records, Himpler mailed a letter to UHC stating "All debts owed to the limited liability company (Midwest) and all claims against the limited liability company will be received by Himpler at the business address set forth above."

k.    On or about May 24, 2016, Himpler sent a fax to UHC stating Midwest went out of business on April 24, 2016.

l.    On or about October 5, 2015, Dr. Sicuro transferred or caused $516,611.00 to be transferred from the Genotec account at Simmons Bank to his personal bank account at US Bank, ending in #4825.

16

m.   On or about November 2, 2015, Dr. Sicuro transferred or caused

$1,271,000.00 to be transferred from the Genotec account at Simmons

Bank to US Bank account #4825.

n.   On or about November 2, 2015, Dr. Sicuro transferred or caused

$397,709.00 to be transferred from the Genotec account at Simmons Bank

to US Bank account #4825.

o.   On or about November 2, 2015, Dr. Sicuro transferred or caused

$66,805.00 to be transferred from the Midwest account at Simmons Bank

to US Bank account #4825.

p.   On or about November 2, 2015, Dr. Sicuro transferred or caused

$215,500.00 to be transferred from the Midwest account at Simmons Bank

to US Bank account #4825.

q.   On or about November 25, 2015, Dr. Sicuro transferred or caused

$297,500.00 to be transferred from the Midwest account at Simmons Bank

to US Bank account #4825.

All in violation of Title 18, United States Code, Section 371.

## Counts 2-7
## Health Care Fraud Scheme
## 18 U. S. C. §§ 1347 and 2

48.   Paragraphs 1 to 18 and 22 to 47 are incorporated by reference as if fully set out

herein.

49.   As part of the scheme and artifice to defraud, Dr. Sicuro and Himpler submitted

and caused reimbursement claims to be submitted to Health Care Insurers, which claims falsely

and fraudulently represented that Midwest or Genotec had performed the listed tests when they

17

knew a reference laboratories had performed the tests. The following are examples of some of these false and fraudulent claims:

| Billed by | Patient | Date of Service | Date of Claim | Amount Billed | Amount Paid | Insurer |
|-----------|---------|-----------------|---------------|---------------|-------------|---------|
| Genotec | AF | 8/28/15 | 9/4/15 | $38,710.00 | $19,355.00 | Aetna Coventry |
| Genotec | DF | 9/11/15 | 9/22/15 | $77,420.00 | $12,774.30 | Aetna Coventry |
| Genotec | KF | 8/24/15 | 9/13/15 | $33,599.79 | $30,239.79 | UHC |
| Genotec | JR | 7/20/15 | 10/13/15 | $56,999.62 | $51,299.63 | UHC |
| Genotec | TF | 6/25/15 | 9/11/15 | $2,649.95 | $354.75 | BCBS |
| Genotec | KG | 8/14/15 | 9/11/15 | $2,649.95 | $354.75 | BCBS |
| MTG | LB | 7/7/15 | 10/2/15 | $34,499.77 | $6,623.97 | Cigna (MTG claims) |
| MTG | BK | 7/22/15 | 8/28/15 | $34,777.00 | $4,137.24 | Cigna (MTG claims) |
| Genotec | MZ | 6/16/15 | 9/3/15 | $4,610.58 | $811.33 | Medicare |
| Genotec | TM | 6/16/15 | 9/3/15 | $4,610.58 | $811.33 | Medicare |

50.     On or about the dates listed below, in the Eastern District of Missouri,

**FRANCO SICURO, M.D.,**
**and**
**CARLOS HIMPLER,**

the defendants herein, knowingly and willfully executed and attempted to execute, the above described scheme or artifice to defraud the listed health care benefit programs, in connection with the delivery and payment for health care benefits, items, and services, that is, the defendants submitted, and caused to be submitted false reimbursement claims for clinical laboratory tests that they knew Genotec and Midwest had not performed:

| Count | Patient | Date of Service | Date of Claim | Amount Billed | Amount Paid | Insurer |
|-------|---------|-----------------|---------------|---------------|-------------|---------|
| 2 | DG | 8/25/15 | 9/17/15 | $33,599.79 | $17,903.79 | UHC |
| 3 | CM | 9/25/15 | 10/14/15 | $56,999.62 | $14,759.96 | UHC |
| 4 | LA | 11/11/25 | 11/23/15 | $27,582.84 | $14,082.84 | Aetna Coventry |
| 5 | DF | 9/24/15 | 10/5/15 | $38,710.00 | $12,774.30 | Aetna Coventry |
| 6 | DD | 11/2/15 | 11/11/15 | $27,582.84 | $10,234.99 | Aetna Coventry |
| 7 | DF | 9/11/15 | 9/22/15 | $77,420.00 | $12,774.30 | Aetna Coventry |

All in violation of Title 18, United States Code, Sections 1347 and 2.

18

**Counts 8-17**
**Health Care Fraud Scheme**
**18 U. S. C. § 1347 and 2**

51.     Paragraphs 1 to 18 and 22-47 are incorporated by reference as if fully set out

herein.

52.     On or about the dates listed below, in the Eastern District of Missouri and

elsewhere,

**FRANCO SICURO, M.D.,**
**and**
**CARLOS HIMPLER,**

the defendants herein, knowingly and willfully executed and attempted to execute, the above

described scheme or artifice to defraud the listed health care benefit programs, in connection

with the delivery and payment for health care benefits, items, and services, that is, the defendants

submitted, and caused to be submitted, false reimbursement claims from both Genotec and

Midwest for clinical laboratory tests that had been unbundled and had not been performed by

either Genotec or Midwest.

| Count | Patient | Date of Service | Claim Submitted by | Claim Amount | Payment Amount | Payment Date | Insurance Company |
|-------|---------|-----------------|--------------------|--------------|----------------|--------------|-------------------|
| 8 | AB | 7/17/15 | Midwest | $6,764,71 | $299.16 | 9/21/15 | UHC |
| 9 | AB | 7/17/15 | Genotec | $56,999.62 | $49,655.92 | 10/16/15 | UHC |
| 10 | NE | 10/22/15 | Midwest | $24,965.77 | $9,362.62 | 11/12/15 | Aetna Coventry |
| 11 | NE | 10/22/15 | Genotec | $2,617.11 | $872.37 | 11/3/15 | Aetna Coventry |
| 12 | DM | 10/23/15 | Midwest | $24,965.77 | $15.926.26 | 11/25/15 | Aetna Coventry |
| 13 | DM | 10/23/15 | Genotec | $2,617.11 | $2,327.66 | 12/3/15 | Aetna Coventry |
| 14 | MK | 10/23/15 | Midwest | $2,465.77 | $1,392.73 | 11/3/15 | Aetna Coventry |
| 15 | MK | 10/23/15 | Genotec | $22,500.00 | $20,250.00 | 11/3/15 | Aetna Coventry |
| 16 | MF | 10/26/15 | Midwest | $2,285.80 | $992.66 | 11/10/15 | Cigna |
| 17 | MF | 10/26/15 | Genotec | $32,399.67 | $2,549.92 | 11/10/15 | Cigna |

All in violation of Title 18, United States Code, Sections 1347 and 2.

19

**Counts 18-19**
**Money Laundering- Monetary Transactions in Property**
**Derived from Specified Unlawful Activity**
**18 U. S. C. § 1957 and 2**

53.     Paragraphs 1 to 18 and 22 to 47 are incorporated by reference as if fully set out

herein.

54.     On or about the dates indicated below, in the Eastern District of Missouri,

**FRANCO SICURO, M.D.,**

the defendant herein, did knowingly engage and attempt to engage in a monetary transaction by,

through, or to a financial institution, affecting interstate or foreign commerce, in criminally

derived property of a value greater than $10,000, such property having been derived from a

specified unlawful activity, that is, a health care fraud scheme, in violation of Title 18, United

States Codes, Sections 1347.

| COUNT | DATE | TRANSACTION |
|-------|------|-------------|
| 18 | Jan. 25, 2016 | $3,000,000.00 check #6500 from US Bank account ending in #4825 payable to Kings Maffett LLC deposited into US Bank account ending in #7468 |
| 19 | Feb. 17, 2016 | $29,642.42 electronic payment from US Bank account ending in #4825 to a Bank of America account |

In violation of Title 18, United States Codes, Sections 1957 and 2.

**Counts 20-21**
**Money Laundering- Monetary Transactions in Property**
**Derived from Specified Unlawful Activity**
**18 U. S. C. § 1957 and 2**

55.     Paragraphs 1 to 18 and 22 to 47 are incorporated by reference as if fully set out

herein.

56.     On or about the dates set forth below, in the Eastern District of Missouri, and

elsewhere,

**CARLOS HIMPLER,**

the defendant herein, did knowingly engage and attempt to engage in the following monetary

transactions by, through, or to a financial institution, affecting interstate or foreign commerce, in

criminally derived property of a value greater than $10,000, such property having been derived

from a specified unlawful activity, that is, a health care fraud scheme in violation of Title 18,

United States Codes, Section 1347.

| COUNT | DATE | TRANSACTION |
|-------|------|-------------|
| 20 | Aug. 3, 2016 | $48,189 check drawn from Carrolton Bank account ending in #6197 payable to Bommarito Automotive |
| 21 | April 6, 2017 | $500,000 check #2010 from Simmons Bank account ending in #3265 payable to Himpler Qualified Spousal Trust deposited into Carrolton Bank account ending in #2829 |

All in violation of Title 18, United States Code, Sections 1957 and 2.

**FORFEITURE ALLEGATIONS**

The Grand Jury further finds by probable cause that:

1.      Pursuant to Title 18, United States Code, Sections 982(a)(7), upon conviction of

an offense in violation of Title 18, United States Code, Section 1347, or conspiracy to commit

said offenses, as set forth in Counts 1 through 17, the defendants shall forfeit to the United States

of America any property, real or personal, that constitutes or is derived, directly or indirectly,

from gross proceeds traceable to the commission of the offense. Subject to forfeiture is a sum of

money equal to the total value of any property, real or personal, constituting or derived from any

proceeds traceable to said offense.

2.      Pursuant to Title 18, United States Code, Section 982(a)(1), upon conviction of

an offense in violation of Title 18, United States Code, Section 1957, as set forth in Counts 18

through 21, the defendants shall forfeit to the United States of America any property, real or personal, involved in such offense, and any property traceable to such property. Subject to forfeiture is a sum of money equal to the total value of any property, real or personal, involved in such offenses, or any property traceable to such property.

      3.      Specific property subject to forfeiture includes, but is not limited to, the following:

      a.      Certain real property located at 227 Lansing Island Dr. Indian Harbour Beach, FL 32937, together with all appurtenance, improvements, and attachments thereon, which is more particularly described as LOT NUMBER: 67; SUBDIVISION: LANSING ISLAND PH 02; CITY/MUNI/TWNSP: INDIAN HARBOUR BEACH; SEC/TWN/RNG/MER: SEC 03 TWN 27 RNG 37; TRACT: 0665001004; Parcel Number: 27-37-03-01-00000.0-0067.00;

      b.      Certain real property located at 10199 Woodfield Lane, St. Louis, MO 63132, together with all appurtenance, improvements, and attachments thereon, which is more particularly described as Lot 25 of Corporate Square Plat No. 3, a subdivision in St. Louis County, Missouri, according to the plat thereof recorded in Plat Book 188 Pages 88 through 90 and Surveyor's Affidavit recorded in Book 7224 Page 2286 of the St. Louis County Records, Parcel #16M-21-0167;

      c.      Certain real property located at 17133 N. Lakeway Ave, Baton Rouge, LA 70810, together with all appurtenance, improvements, and attachments thereon, which is more particularly described as Country Club of Louisiana, Parcel 16, Phase IV, Lot, Parcel #00126284;

      d.      2013 Audi S8 Quattro, VIN: WAUD2AFD3DN017148;

      e.      2015 Cadillac Escalade, VIN: 1GYS4BKJ9FR273158;

      f.      2019 Land Rover Range Rover, VIN: SALGS2SVXKA544511;

      g.      $654;806.74 in electronic funds from Carrollton Bank account ending in #2829 held in the name of Himpler Qualified Spousal Trust dated 9/24/15;

      h.      $200,000.00 in electronic funds previously held in Carrollton Bank account ending in #2829 held in the name of Himpler Qualified Spousal Trust dated 9/24/15;

i.  All funds, credits, and monetary instruments up to $80,213.98 in or associated with Carrollton Bank account ending in #6444 held in the name of Carlos Himpler and Ashley Himpler;

j.  All funds, credits, and monetary instruments in or associated with LPL Financial investment account ending in #1498 held in the name of Carlos Himpler & Ashley Himpler TTEES Himpler Qualified Spousal Trust DTD 09-24-15;

k.  All funds, credits, and monetary instruments in or associated with LPL Financial investment account ending in #5497, held in the name of Carlos Himpler & Ashley Himpler TTEES Himpler Qualified Spousal Trust DTD 09-24-15;

l.  All funds, credits, and monetary instruments up to $200,000.00 in or associated with Interactive Brokers Account ending in #0716 held in the name of Carlos Himpler TOD Ashley Himpler;

m.  All funds, credits, and monetary instruments up to $300,000 in or associated with LPL Financial investment account ending in #6010 held in the name of Franco Sicuro TTEE Sicuro Living Trust DTD 10-22-01; and

n.  All funds, credits, and monetary instruments up to $1,000,000.00 in or associated with PNC Wealth Management Account ending in #8063, held in the name of Angela Clemente Trust.

4.  If any of the property described above, as a result of any act or omission of the defendants:

a.  cannot be located upon the exercise of due diligence;

b.  has been transferred or sold to, or deposited with, a third party;

c.  has been placed beyond the jurisdiction of the court;

d.  has been substantially diminished in value; or

e.  has been commingled with other property which cannot be divided without difficulty;

the United States of America will be entitled to the forfeiture of substitute property pursuant to

Title 21, United States Code, Section 853(p).


                                        A TRUE BILL.


                                        _____
                                        FOREPERSON

CARRIE COSTANTIN
Attorney for the United States
Acting Under Authority
Conferred by 28 U.S.C. § 515


_____
DOROTHY L. McMURTRY, #37727MO
Assistant United States Attorney